## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**BRIAN M. ADLEY,**
    Debtor

Chapter 7
Case No. 04-15133-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**THE UNDERWRITERS AT LLOYD'S,
LONDON, subscribing to CERTIFICATE
NUMBER 823/FD0000677,**
    Plaintiff
v.
**CHANCELLOR CORPORATION, BRIAN M.
ADLEY, ANN M. ADLEY, FRANKLYN
CHURCHILL, RUDOLPH PESELMAN,
NOEL DONNELLY, KEY EQUIPMENT
FINANCE, a division of KEY CORPORATE
CAPITAL, INC. f/k/a KEYCORP LEASING LTD.,
and JOHN AQUINO, AS CHAPTER 7 TRUSTEE**
    Defendants

Adv. P. No. 04-1443

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

### I. INTRODUCTION

Several matters are before the Court: 1) the "Joint Motion of the Chapter 7 Trustee

and Underwriters at Lloyds for Approval of Settlement Agreement and for Certain

Injunctive Relief" (the "Joint Motion") (#172); 2) the Objection of Defendant Ann M. Adley

to the Joint Motion (#205), as well as her Surreply Opposing the Joint Motion (#229); 3) the

1

Opposition to Joint Motion filed by McDermott Will & Emery ("McDermott") (#229) in the

Debtor's Chapter 7 case as it is not a party in the above-captioned adversary proceeding,

as well as McDermott's Supplemental Memorandum Opposing Joint Motion (#246).[1] The

Underwriters at Lloyd's, London ("Lloyds"), subscribing to Certificate Number

82/FD0000677, filed both a First (#209) and Second Reply (#216) in Support of the Joint

Motion, as well as a Supplemental Brief Regarding the Joint Motion (#227). Key

Equipment Finance, Inc., f/k/a Keycorp Leasing, Ltd., ('Key"), filed a Reply to

McDermott's Opposition to the Joint Motion (#238). Rudolph Peselman ("Peselman") and

Davis, Malm & D'Agostine, P.C. ("Davis, Malm") also filed a Memorandum in Support of

the Joint Motion (#226).

Additional matters in the adversary proceeding are before the Court: 1) Lloyds'

Motion to Dismiss the Counterclaim of Brian Adley (the "Debtor") (#173); 2) Lloyds'

Second Motion to Dismiss the Counterclaim of Ann M. Adley (#174);[2] and 3) "Defendant

Ann M. Adley's Motion for Leave to Withdraw her Answer and Counterclaim and

Substitute a Motion to Dismiss or Abstain from Lloyds Interpleader Action" (#204) (the

"Motion for Leave to Withdraw or Abstain"), which also contains an opposition to Lloyds'

---

[1] McDermott does not represent Brian Adley in his Chapter 7 case or in this adversary proceeding. It represents that it is counsel to Brian Adley, Ann Adley, and Chancellor Corporation in litigation involving the Securities and Exchange Commission and Walter E. Huskins.

[2] On April 15, 2005 Lloyds filed a Motion to Dismiss the Counterclaim of Ann M. Adley or in the Alternative for a More Definite Statement (#116). The Court heard that Motion on May 31, 2005 and continued the matter generally in view of the reported settlement of Lloyds' Complaint.

Motion to Dismiss her Counterclaim. Lloyds filed an Objection to Ann Adley's Motion for Leave to Withdraw or Abstain (#217), as well as a Supplemental Brief Regarding her Motion (#227); Ann Adley filed a Supplemental Memorandum in Further Support of her Objection to Lloyds' Motion to Dismiss her Counterclaim and a Reply Regarding her Motion for Leave to Withdraw or Abstain (#229).

On September 21, 2005, the Court heard the above matters, which relate to Lloyds' Complaint for Interpleader and Declaratory Relief and the allocation of the proceeds of the "Directors and Officers and Company Liability Certificate," a claims made and reported insurance policy (the "Certificate" or the "Policy"). Derek Coulter ("Coulter"), a party with a claim against the insurance proceeds filed an Opposition to the Joint Motion in open court on September 21, 2005. At the conclusion of the hearing, the Court granted the parties an opportunity to submit further memoranda, and took the matters under advisement.

This adversary proceeding was commenced by Lloyds as an interpleader action for the stated purpose of determining whether the Policy's proceeds are property of the estate in light of certain coverage disputes and, if so, to resolve the interests of the Defendants in those proceeds. Lloyds commenced this action because it was faced with the demands for payment of defense costs and judgments which, if covered, would have exhausted the limits of the Policy.

The parties to the Joint Motion propose a Settlement Agreement and Release (the "Settlement" or the "Partial Settlement") of this interpleader action. The Settlement

3

provides, *inter alia*, that Lloyds shall: 1) release the estate of all of its claims and pay the estate the sum of $40,000; 2) settle claims with certain Defendants in this adversary proceeding, as well as other non-defendants, who have agreed to take a reduced distribution on their asserted claims against Lloyds; 3) exchange mutual releases with the settling parties; and 4) deposit a reserve amount (the "Reserve") into the Court registry for the asserted claims of the non-settling parties. The Settlement is conditioned upon an order from this Court providing for an injunction that would preclude any person receiving notice or constructive notice of the Joint Motion from prosecuting any action against Lloyds regarding the Policy.   The parties to the Settlement include Lloyds and the following Defendants: the Chapter 7 Trustee, John Aquino (the "Trustee"), Peselman, Franklin Churchill ("Churchill"), and Key.  Other parties to the Settlement, who were not named as defendants, are Walter E. Huskins ("Huskins"), Wilmer, Cutler, Pickering, Hale and Dorr, LLP, ("Wilmer Cutler"), Davis, Malm, Herten, Burstein, Sheridan, Cevasco, Bottinelli, Litt, Toskos & Hartz LLC ("Herten, Burstein"), and Ayres Carr & Sullivan, P.C. ("Ayers Carr").  As stated above, the Settlement is opposed by Defendants, Brian Adley and Ann Adley as well as by McDermott and Coulter.

Since filing the interpleader action, Lloyds has asserted that the Bankruptcy Court is the ideal forum to secure "complete peace" with respect to the Policy by submitting for approval a Settlement among it and some of the Defendants and others with claims against the Policy, parties who may or may not be creditors of the Debtor's estate, and who may or may not have filed proofs of claim against the estate. The Settlement purports to directly

4

address the claims of non-settling parties, only some of whom are Defendants, and who

may or may not be creditors of the Debtor's estate, by fully reserving amounts asserted by

them against the Policy.

The salient issue presented is whether this Court has jurisdiction to enter the

injunctive relief requested by the parties to the Joint Motion as part of their Settlement.

An additional issue, assuming the Court were to conclude it has "related-to" jurisdiction,

is whether the proponents of the Settlement satisfied their burden with respect to the

approval of the Settlement and the entry of injunctive relief in favor of Lloyds. For the

reasons set forth below, the Court concludes that it lacks jurisdiction to enter the relief

requested, and, accordingly, denies the Joint Motion.

## II. PROCEDURAL AND FACTUAL BACKGROUND

On June 18, 2004, the Debtor, who was an officer and director of now defunct

Chancellor Corporation, filed a voluntary Chapter 7 petition. At the time he filed the

petition, and to this day, he has been unrepresented by counsel in his bankruptcy case and

in this adversary proceeding.[3]

On October 29, 2004, the Debtor filed Schedules and a Statement of Financial Affairs.

On Schedule B-Personal Property, he did not list either the Policy or its proceeds as assets.

On Schedule F-Creditors Holding Unsecured Nonpriority Claims, he listed "Stern c/o

Attorney Michael Liston," and "Key Bank,"as well as "others." With respect to those

claimants, he stated: "the details of these + others have been previously filed," a reference

---

[3] *See* Note 1, *supra.*

5

to an "Unsecured Creditor Listing" attached to his petition. In completing Schedule F, the

Debtor neither identified co-debtors or indicated whether the debts he listed were

contingent, unliquidated, or disputed. The "Unsecured Creditor Listing" included the

following creditors whose claims do not appear to be consumer claims based upon the

Debtor's description of the nature of the claims: Lawrence Stern (debt guaranty of

another), Merrill Lynch (debt guaranty of another), Ernest Rolls (debt guaranty of another),

Hudson Savings (Shortfall on Mortgage of Investment Property), Middlesex Federal

(Shortfall on Mortgage of Investment Property), John D. Collucci (guaranty of professional

services provided to another), Noel Donnelly (guaranty of professional services provided

to another), Sugarman, Rogers, & Cohen (professional services), Wollmuth, Maher &

Deutsch, LLP (professional services), Perkins, Smith & Cohen (professional services), P.A.

Landers (guaranty payment for services provided to another), Derek Coulter (guaranty of

professional services provided to another), Thompson Financial Services (subscriptions and

dues for a business entity), Samuel Nagler, Esq. (guaranty of professional services relating

to a business venture), Securities & Exchange Commission (current civil litigation), Walter

Huskins (current civil litigation), Trent Davis (current civil litigation), Robert Feige (current

civil litigation), Patricia Feige (current civil litigation), John Cox (current civil litigation),

Timothy Cox,(current civil litigation), American Express (guaranty debt), David Nickless,

Trustee for Marketechs (current civil litigation), Key Bank (current civil litigation),

Massachusetts Department of Revenue, Singer & Singer (professional services), and "other

as may be adjusted." In a "Creditor Listing" containing the addresses of his creditors,

6

creditors, which he attached to the petition in addition to the "Unsecured Creditor Listing,"
the Debtor also listed Charles P. Kazarian (Kazarian").

On February 17, 2005, the Court issued a "Notice to Creditors to File Claims,"
establishing May 18, 2005 as the deadline for non-governmental entities to file proofs of
claim. The Court takes judicial notice that on February 19, 2005, the Notice was mailed to
the creditors listed by the Debtor at the time he filed his petition, including Key and its
counsel, and Huskins, as well as Noel Donnelly ("Donnelly"), Coulter, and Kazarian, who,
as will be discussed below, are identified as holding Adley- Related Claims.[4] Additionally,
the Notice was mailed to McDermott and Peselman's counsel, Davis, Malm, as well as to
counsel to Lloyds. Other signatories to the Settlement, including Churchill, Wilmer Cutler,
Herten, Burstein, and Ayres Carr, as well other so-called, "Adley-Related Claimants,"
as defined in the Joint Motion discussed below, were not sent a copy of the Notice. Those
Adley-Related Claimants who were not sent the "Notice to Creditors to File Claims"
included Ann Adley, Jennifer Martin, Testa Hurwitz Thibeault, FTI Ten Eyck, Brown &
Brown, and Dwyer & Collora.

The Debtor was an officer and director of Chancellor Corporation, as were at least
two other defendants in this proceeding, Peselman and Churchill. Neither Donnelly, an

---

[4] The Court takes judicial notice that Key filed a proof of claim in the sum of
$1,369,222, which claim, though reduced to judgment against Churchill, has not been
reduced to judgment against the Debtor. Lloyds filed a contingent claim in the sum of
$1,823,740.34; Huskins has filed a proof of claim in the sum of $14,770,000. None of the
other Adley-Related claimants or the other officers and directors of Chancellor
Corporation and the professionals who represented them filed proofs of claim.

officer or an employee of Chancellor Corporation, nor Chancellor Corporation filed answers to Lloyds' "Complaint for Interpleader and Declaratory Relief." The remaining named Defendants filed Answers and Counterclaims. Lloyds and all the Defendants who answered the Complaint, except the Debtor and his spouse, Ann M. Adley, executed the Settlement which is the subject of the Joint Motion. Additionally, Huskins, on his own behalf and on behalf of the other minority shareholders of Chancellor Corporation, Davis, Malm, on its own behalf and on behalf of its shareholders, Herten, Burstein, on its own behalf and on behalf and on its members, and Ayres Carr, on its own behalf and on behalf of its shareholders, executed the Settlement Agreement and Release, although they were not named as defendants in this adversary proceeding.

Lloyds filed its Complaint for Interpleader and Declaratory Relief on December 21, 2004. The Complaint has spawned numerous pleadings. Additionally, this Court, on March 30, 2005, following the filing of Lloyds' "Motion to Deposit the Proceeds of the Directors and Officers Liability Policy in Connection with Underwriters' Interpleader Action"(#8) and Key's "Motion to Dismiss, or in the Alternative Stay, Plaintiff's Interpleader Adversary Proceeding"(#21), issued an order to show cause why it should not abstain from the above-captioned adversary proceeding. On May 31, 2005, after receiving a report of a settlement in principle, this Court continued the motions filed by Lloyds and Key generally, as well as its order to show cause to which Lloyds, Key and the Chapter 7

8

Trustee responded.[5]

A. <u>The Complaint for Interpleader and Declaratory Relief</u>

A summary of the Complaint for Interpleader is critical to an understanding of the

the Settlement described in the Joint Motion. In its Complaint, Lloyds described the nature

of its action as follows:

> This is an action (i) for declaratory judgment as to whether certain insurance
> proceeds are property of the estate and to determine the interests of others
> in those proceeds (if property of the estate), (ii) for injunctive relief relating
> to property of the estate subject to the automatic stay, (iii) in the nature of
> Interpleader brought pursuant to Rule 7022 of the Federal Rules of
> Bankruptcy Procedure and Rule 22 of the Federal Rules of Civil Procedure,
> and (iv) for Declaratory Relief pursuant to 28 U.S.C. §§ 2201, 2202.

Complaint at ¶1. Additionally, it averred that it issued a Directors and Officers and

Company Liability Certificate to Chancellor Corporation under which Chancellor and

certain of its Directors and Officers, which it identified as the "Actual and Alleged

Insureds," have sought insurance coverage "in connection with numerous claims, lawsuits

and other matters for which there may or may not be insurance coverage under the

---

[5] On February 29, 2005, this Court denied the Debtor's Motion for Relief from the
Automatic Stay, which was filed on his behalf by McDermott. Through the Motion,
McDermott sought relief "to allow him [the Debtor] to mount a meaningful defense
against an unstayed Securities and Exchange Commission civil enforcement action," as
well as authorization for the payment from the Policy proceeds of McDermott's future
legal fees and costs in the sum of $400,000 ($100,000 to pay expert witnesses, deposition
fees and others costs, and $300,000 to cover future legal fees for depositions, expert
discovery and trial). The Court found that the objections to the Motion were
meritorious and that the "policy and proceeds are property of the estate, and that there
are competing claims against the policy." On March 1, 2005, this Court denied Key's
"Motion Seeking Modification or Relief from the Automatic Stay to Permit Key to Seek
an Order from the United States District Court for the District of New Jersey Finally
Determining the Turnover Motion."

Certificate, which are pending in various federal and state courts." Id.

It added:

> Underwriters [Lloyds] have been apprised of and have received demands
> which have led them to reasonably believe that the various claims, if covered,
> will exhaust the total uneroded limits of liability of the Certificate without
> providing for releases of liability for all potentially implicated Actual and
> Alleged Insureds in all of the pending matters, and having no funds for
> payment of the actual and alleged Insureds' defense costs. Furthermore, in
> the face of conflicting and competing demands for payment of defense costs
> as well as judgments, Underwriters are unable to determine which of their
> Actual and Alleged Insureds are entitled to the proceeds and limits of the
> Certificate. . . .

Complaint at ¶ 2.

At the time Lloyds filed its Complaint, it alleged that the Actual and Alleged

Insureds had submitted numerous claims for coverage,[6] and Lloyds had reserved its rights

with respect to all claims involving litigation among Huskins, Chancellor Corporation, the

Debtor, Ann Adley, Churchill, Peselman, Key, and the Securities and Exchange

---

[6] Under the Policy, Chancellor Corporation and its directors and officers were
identified as the insureds. Directors and officers were defined as "all persons who
were, now are, or shall be directors or officers of the Company and all persons serving
in a functionally equivalent role for the parent Company or any Subsidiary operating or
incorporated outside the United States." Complaint, Exhibit A, ¶ II.H.1. Directors and
officers were also defined to include "all persons who were, now are, or shall be
employees of the Company" to the extent of any claim for an Employment Practice
Violation or a Securities Law Violation, id. at ¶ II.H.2, and "the lawful spouse of any of
the persons set forth in the above provisions of this definition, but only to the extent the
spouse is a party to any Claim solely in the capacity as spouse of any such persons and
only for the purposes of any Claim seeking damages recoverable from marital
community property, property jointly held by any such person and the spouse, or
property transferred from any such person to the spouse, including their estates, heirs,
legal representatives or assigns in the event of their death, incapacity or bankruptcy."
Id. at ¶ II.H.3.

Commission, and others, which it described as the underlying litigation.[7]   In

---

[7] Specifically, Lloyds denominated the following actions as the "Underlying Litigation and Claims":

1. *Walter E. Huskins, on Behalf of himself and others v. Chancellor Corporation, Brian Adley, Ann M. Adley, Individually and as Trustee of Cape Home Realty Trust, Franklyn Churchill, Coulter, Rudolph Peselman, Gregory Davis and BKR Metcalf Davis, Eleanor Murphy, as she is Trustee of Jefferson Realty Trust, Bartholomew Murphy, Jr., as he is trustee of the Wilson Road Trust and Sean P. Adley,* currently pending in the Superior Court Department of the Trial Court of Middlesex, Commonwealth of Massachusetts, Civil Action Number 04-1714F;

2. *Walter E. Huskins, on Behalf of himself and others v. Chancellor Corporation, Brian Adley, Franklyn Churchill, David Volpe, Jonathan Ezrin, Rudolph Peselman, Gregory Davis and BKR Metcalf Davis,* filed in the United States District Court for the District of Massachusetts, Civil Action Number 03-11525-MEL filed on August 12, 2003;

3. *Walter E. Huskins, Jr. derivatively for Chancellor Corporation, v. Brian M. Adley (In re Brian M. Adley),* Chapter 7 Case No. 04-15133-JNF, Adversary Proceeding No. 04-01246, filed on June 18, 2004 in the United States Bankruptcy Court for the District of Massachusetts;

4. *Securities and Exchange Commission v. Chancellor Corporation, Brian Adley, Franklyn Churchill, David Volpe, Jonathan Ezrin, Rudolph Peselman, Gregory Davis and BKR Metcalf Davis,* pending in the United Stated District Court, District of Massachusetts, Civil Action Number 03-10762-MEL, filed on April 24, 2003;

5. *Key Equipment Finance, a division of Key Corporate Capital, Inc., formerly known as Keycorp Leasing Ltd. v. Chancellor Fleet Corporation, Chancellor Fleet Remarketing, Inc., Chancellor Corporation, Brian M. Adley and Franklyn E. Churchill,* filed in the United States District Court for the

11

particular, Lloyds referenced a demand for payment made by Key in the sum of $1,369,222,

plus interest and costs, by virtue of a writ of execution with respect to Churchill's claimed

right, title and interest in and right of payment under and pursuant to the Certificate, as

well as a motion filed by Key in the United States District Court for the District of New

Jersey.  In its Motion to Deposit Proceeds, it explained that if it were to pay the Key

judgment, Adley and the other directors and officers of Chancellor Corporation would be

left uninsured for defense costs and losses incurred by virtue of the various lawsuits,

adding: "Underwriters may be subjected to claims from the non-settling Insureds that the

Certificate proceeds were improperly paid for the benefit of some but not all Insureds."

Motion to Deposit Proceeds, at ¶ 9.

In its Complaint, Lloyds also averred that coverage was precluded under the Policy

for the Key Lawsuit by virtue of Exclusion G as amended by Endorsement Number 9,

which in essence absolved Lloyds from making payments in connection with any claim

---

District of New Jersey, Civil Action Number 01-Civ. 4012
(JAP) (the "Key Lawsuit");

6. *Jim R. Sapp, Individually and as Trustee for the Lindsey Sapp
Trust, the Ryan Sapp Trust, the Nathan Sapp Trust, and the
Nicholas Sapp Trust, Theresa D. Sapp, Leonora M. Sapp and
Sapp Family, L.L.C. v. Chancellor Asset Management, Inc.,
Chancellor Corporation, Franklyn E. Churchill, Lawrence
Stern and Brian M. Adley, filed on March 13, 2001 in the
Marion County Superior Court, State of Indiana, Case No.
49D07-0107-CP-000345.*

7. certain proceedings initiated against certain of the insureds.

Complaint at ¶ 15.

brought about by or contributed to by "any deliberately dishonest, fraudulent or criminal act or omission by any of the Assureds, or . . . any personal profit or advantage gained by any of the Directors and Officers to which they were not legally entitled." Complaint at ¶ 28. It also disclaimed coverage on a variety of other grounds, and it disclaimed coverage of certain of the fees and costs incurred by the Debtor, as well as coverage relating to any disgorgement order sought by the Securities and Exchange Commission in litigation it commenced against Adley and Churchill.

In its Complaint and in the Motion to Deposit Proceeds, Lloyds stated that it did not have "sufficient uneroded limits of liability remaining to fund the judgments entered in the Key Lawsuit, the cost of defending the Underlying Litigation, and any future judgment or settlement of the Underlying Litigation and Claims." Complaint at ¶ 59. It added: ". . . if the judgments entered in the Key Lawsuit were funded, other insureds would be left uninsured for the defense costs and losses incurred by virtue of the other Underlying Litigation and Claims, potentially subjecting the Underwriters to claims that the Certificate' [sic] limits were improperly paid for the benefit of some insureds, but not others." Id.

In Count III of its Complaint, through which it sought authority to interplead the remaining insurance proceeds, it also averred that "the demands for coverage under the Certificate exceed the uneroded limits of liability of the Certificate" and that it was "in great doubt as to which defendant is entitled to be paid under the Certificate, if the Defendant is entitled to any payment at all." Id. at ¶ 61. It also stated that it could not reasonably determine which Defendant is entitled to what portion, if any, of the uneroded

13

limits of liability of the Certificate and that it "should not be compelled to run the risk of

determining which Defendants should receive payment under the Certificate for losses

they allege to have sustained as a result of the Underlying Litigation and Claims for which

they seek coverage." Id.  In conclusion, Lloyds sought, *inter alia,* a judgment discharging

it and any and all of its current and former agents, representatives or related companies

from all further liability relating in any way to the Underlying Litigation and Claims and

a preliminary and permanent injunction barring and enjoining the Defendants from

> (i) asserting any claims, rights, causes of action, or demands of whatever nature, whether known or unknown, foreseen or unforeseen, under the Certificate against the Insurers and each of their parents, subsidiaries, affiliates, insurers, reinsurers, directors, officers, employees, agents, representatives, attorneys, and their respective heirs, executors, administrators, successors and assigns;

> (ii) instituting, commencing or prosecuting any arbitration proceeding, or any legal proceeding in any state or federal court, against the Insurers and each of their parents, subsidiaries, affiliates, insurers, reinsurers, directors, officers, employees, agents, representatives, attorneys, heirs, executors, administrators, successors and assigns, with respect to or for any claims, causes of action, rights, attorneys' fees, costs, expenses, judgments, settlements, liabilities and damages, of whatever nature, whether known or unknown, foreseen or unforeseen, that have been could have been, or could be asserted in any form, either directly or indirectly, based upon, arising out of, relating to, concerning, resulting from or in consequence of, or in connection with:
> > 1. the Certificate;
> > 2. [t]he Underlying Litigation and Claims;
> > 3. any past, present or future notice of claim or notice of potential claim under the Certificate;
> > 4. any claim for coverage for "Loss" under the Certificate, including, but not limited to costs, defense, indemnity or any other payments, services or benefits under the Certificate or which otherwise relate to the Certificate;
> > 5. any aspect of the Insurers' performance (or lack of performance) of any duties or obligations under the Certificate,

14

whether such duties or obligations are contractual, extracontractual, tort, or otherwise, including without limitation any claims, demands or causes of action relating to any alleged claims handling, claims adjustment, payments, exhaustion, negligence, breach of contract, breach of duty or duties, breach of good faith and fair dealing, bad faith, interference with contractual relationships, deceptive trade practices, conduct in violation of any insurance code or any other alleged misconduct, omission or wrongdoing of any kind;

6. any alleged right to recover any payments of any defense fees, costs, charges or expenses made by the Insureds under the Certificate; or

7. any and all duties, liabilities and obligations under the Certificate.

Complaint at pp. 15-18.

B. The Answers and Counterclaim of Ann Adley

In her Answer, Ann Adley admitted that she is seeking recovery, including reimbursement of defense costs incurred, against the Policy. In her Counterclaim, she averred that she made payments to support the defense of various claims presented against individuals entitled to coverage under the Certificate; that the payments "were made upon the suggestion of representatives of the plaintiff, with full knowledge of representatives of the plaintiff, and with the approbation of the plaintiff;" that the payments were made because Lloyds failed to make timely payments to reimburse individuals involved in the support of the litigation against individuals entitled to coverage; that she was advised to advance monies to support the defense of claims; and that Lloyds failed and refused to reimburse her, resulting in great personal damage and harm to . . . [her] . . . , including the loss of the residence where she lived with her children."

15

C. The Counterclaim of Brian Adley

The Debtor, in his Counterclaim, requests that this Court declare that Lloyds is obligated to pay all expenses and costs associated with the defense of the civil action commenced by the Securities and Exchange Commission; that Lloyds be ordered to pay damages as a result of its bad faith and negligence in failing to provide him with the full benefits afforded by the Policy; and that he be awarded triple damages pursuant to Mass. Gen. Laws c. 93A.

D. The Joint Motion

In their Joint Motion, Lloyds and the Trustee provided the Court with a broad overview of the structure of the Settlement. They state in relevant part the following:

> The Settlement Agreement involves a partial settlement of major portions of the Interpleader Action. Specifically, the Settlement Agreement resolves: Litigation over coverage of the $1.5 million judgment ($1.7 million as of this date, with postjudgment interest) that Key has against Churchill, with a payment of $1.0 million to Key, plus Key's share of any other proceeds; Litigation over coverage of claims of the estate for up to $60,000 of prepetition reimbursement of allegedly covered defense costs paid by Brian Adley, with a payment of $40,000 to the estate; Litigation over coverage of over $375,000 of defense costs incurred by Churchill, with payments of approximately 75% of asserted claims; Litigation over coverage of over $115,000 of defense costs incurred by Pesselman [sic], with payments of approximately 75% of asserted claims; and Litigation over priority of covered claims among the Settling Claimants, by treating them *pari passu* with respect to any policy proceeds that remain after payment of other covered claims that have priority.
>
> A central part of the settlement is that, upon the satisfaction of the conditions to the Settlement Agreement (primarily that there be court orders providing that Lloyds will not have any further liability with respect to the Policy, and that certain extracontractual counterclaims against Lloyds are dismissed with prejudice), Lloyds will place the entire Policy proceeds in the Court registry and make no further claim to the Policy proceeds, which will either be

16

distributed to valid, priority covered claims of the nonsettling claimants or, *pari passu*, to the Settling Claimants, all of whom are agreeing in the settlement to take a reduced distribution from their asserted claims to the Policy proceeds.

The Settlement Agreement also provides for very large releases of claims against the estate. Lloyds is releasing a $1.8 million contingent claim and Huskins is settling his asserted $17 million claim for a cash payment from Policy proceeds of $50,000. These claims reductions will leave approximately $3-4 million of claims in the estate, and make it likely that further recoveries by the Chapter 7 Trustee, whether in the Interpleader Action or otherwise, will result in a meaningful distribution to creditors. Thus, the Settlement Agreement is a path to transform this case from a no-asset case into one with at least some recovery.

The Settlement Agreement's structure directly addresses the claims of nonsettling parties (the so-called "Adley-Related Claimants", all of whose claims directly involve defense of the debtor, Mr. Adley, in various actions) by fully reserving in the Court registry for amounts asserted by the parties to the Interpleader Action who are not settling. In this way, those parties will not be prejudiced by the settlement, and retain all colorable claims to recover Policy proceeds. The nonsettling parties will be entitled to prove that they have covered claims with priority, just as they are now entitled to do in the Interpleader Action. *Settling Parties will retain their rights to litigate the entitlements of the nonsettling parties, including (i) coverage of the claims of nonsettling parties, (ii) whether the claims of the settling parties (in the amounts allowed pursuant to the settlement) have priority over the coverage claims of the nonsettling parties, and (iii) whether certain claims for coverage by the Adley-Related Claimants are in fact property of the estate, with recoveries to be paid to the Chapter 7 Trustee.*

The final major components of the Settlement Agreement are its extensive releases. The Settling Claimants and Lloyds are, essentially, exchanging mutual global releases. However, the Settlement Agreement [sic] goes further, and actually provides that various parties are providing releases to the nonsettling claimants. For example, Key is releasing Mr. Adley from all liability, except for Key's claims to remaining Policy proceeds and a claim in the bankruptcy case (i.e. Key will not benefit from any nondischargeability order). Thus, not only does the Settlement Agreement preserve all colorable rights of the nonsettling claimants to the Policy, by setting up a fully funded Disputed Claims reserve, but it also gives those nonsettling claimants various valuable releases.

Joint Motion at ¶¶ 1-5 (footnote omitted)(emphasis added).

The moving parties attached an 18-page proposed order to their Joint Motion. The proposed order contains certain findings of fact and conclusions of law, including a finding that "[t]he Policy and its proceeds are property of the estate of Brian Adley. . . [and that] . . . [a]ny claims of Brian Adley against Lloyds, arising from any action or inaction of Lloyds prior to the Petition Date, are property of the estate of Brian Adley." It also requires that this Court dismiss with prejudice the counterclaims filed by the Debtor and Ann Adley "insofar as those counterclaims assert any cause of action except to the Policy Proceeds." The settling parties require this Court to find that "[t]he claims of the Adley Related Claimants [i.e., the nonsettling parties whose claims allegedly involved the defense of the Debtor in various actions] against the Policy Proceeds, as of the Petition Date and as of the date of this order, are equal to or less than the amount of the Disputed Proceeds that will remain the subject of this Interpleader." Finally, they asked this Court to find the following:

> that a permanent injunction should issue in this action for the following reasons: (1) under the circumstances timely and appropriate notice of, and opportunity to be heard regarding, this Order and the Settlement Agreement has been provided to all known and unknown persons who have or may assert a claim under the Policy via mail or; (2) Lloyds and the Settling Claimants have a legitimate desire to fully and finally resolve all disputes amongst themselves relating to the Policy and/or Lloyds; (3) a permanent injunction will allow the Chapter 7 Trustee to advance the administration of the Adley Bankruptcy estate; and (4) such injunction is necessary and proper to adjudicate the Lloyd's [sic] Interpleader.

Thus, if this Court were to grant the Joint Motion, it also would be granting the Motion to Deposit Proceeds, Lloyds would be depositing the sum of $2,373,475.34 - - the balance of

18

the available Policy proceeds before any payments to the parties to the Settlement -- in

the Registry of this Court, and the Clerk, after receiving notice of final orders with respect

to the Joint Motion and its Motions to Dismiss the Counterclaims filed by the Debtor and

Ann Adley, would then be authorized and directed to distribute the amounts listed to the

following parties:

| | |
|---|---|
| Key (payment to Key Equipment Finance, Inc., c/o Steven J. Mandelsburg, Hahn & Hessen LLP, 488 Madison Avenue, New York, NY) | $1,000,000 |
| Hale & Dorr (payment to Wilmer Cutler Pickering Hale & Dorr LLP, attn: Mr. Robert Keefe, 60 State Street, Boston, MA 02109)[8] | $283,375.50 |
| Davis, Malm (payment to Davis, Malm & D'Agostine PC, attn: Gary Matsko, One Boston Place, Boston, MA 02110)[9] | $87,861.75 |
| The Chapter 7 Trustee (payment to John Aquino, as Trustee, Anderson Aquino LLP, 260 Franklin St., Boston, MA 02110) | $40,000.00 |
| Herten (payment to [ ]) [sic] | $8,212.28 |
| Ayres (payment to Ayres, Carr & Sullivan, P.C., 251 East Ohio Street, Suite 500, Indianapolis, IN 46204-2186) | $4,581.65 |

[8] At the September 21, 2005 hearing, it was represented that Wilmer Cutler, formerly, Hale & Dorr, served as counsel to Churchill and that Herten, Burnstein, and Ayres Carr provided services to Churchill. However, it is unclear whether they may have provided services to the other officers and directors of Chancellor Corporation, including the Debtor.

[9] Davis, Malm served as counsel to Peselman in litigation with the Securities and Exchange Commission.

Additionally, the Trustee would be authorized to pay Huskins's counsel $50,000 upon

approval of the settlement.   The proposed order further provides:

> The remainder of the deposited Policy Proceeds (the "Disputed Proceeds"),
> that are not distributed in accordance with paragraph 4 above, shall remain
> subject to the Lloyds Interpleader, and, following the Effective Date, shall
> remain available to pay the following claimants (the "Adley-Related
> Claimants"), or the Chapter 7 Trustee to the extent that payments for the
> Adley-Related Claims are held by this Court to be payable instead to the
> estate, to the extent that such claimants are ultimately determined by Final
> Order to have covered claims agains t [sic] the Policy with priority over the
> claims of the Settling Claimants and are entitled to payment: Brian Adley,
> Ann Adley, McDermott Will & Emery LLP, Noel Donnelly, Coulter, Testa
> Hurwitz Thibeault, FTI Ten Eyck, Brown & Brown, Michael A. Collora and
> Dwyer & Collora, LLP, Charles P. Kazarian and Law Office of Charles P.
> Kazarian, P.C. and Jennifer Martin.

> Key, Hale, Davis Malm, the Trustee, Herten, and Ayres shall also be entitled
> to the payment from the Disputed Proceeds of each of their respective *pro
> rata* share, based on the total amount paid to them . . .

At the September 21, 2005 hearing on the Joint Motion, the proponents of the Settlement

Agreement submitted a Chalk listing the non-settling "Adley-Related Claimants" and the

amount reserved for their claims as follows:

| | |
|---|---|
| Ann Adley | $181,000.00 |
| McDermott | $485,601.52 |
| Noel Donnelly | $ 32,591.00 |
| Coulter | $ 69,171.00 |
| Kazarian | $ 34,287.00 |
| Testa | $ 17,954.00 |
| FTI Eyck's[sic] | $ 13,315.62 |
| Brown | $ 7,875.00 |
| Dwyer & Collora | $ 7,193.45 |

Jennifer Martin was not included in the Chalk.  At the hearing, McDermott, represented

that it served as counsel to the Debtor, Chancellor Corporation, and Ann Adley.  Coulter,

20

who appeared *pro se*, represented that he was a consultant for Chancellor Corporation for five years and worked for the benefit of all the insureds. Counsel represented that Donnelly was an employee of Chancellor Corporation. Counsel further represented that the firm of Testa Hurwitz provided services to the Debtor or Chancellor Corporation, although counsel to the Trustee stated that the firm represented Donnelly and had "nothing to do with the Debtor." Counsel also represented that the accounting firm of FTI Ten Eyck was retained for the benefit of the Debtor, Churchill and Peselman in the Securities and Exchange Commission litigation. The Debtor, appearing *pro se*, represented that Kazarian represented him, Churchill, Peselman, and Chancellor Corporation in various matters. According to counsel, Brown was an accountant who performed services for the Debtor during the Security and Exchange Commission litigation.

Notably, many of the signatories to the Settlement Agreement were not listed by the Debtor as creditors. Morever, except for the Trustee, Key, Peselman, and Churchill, none were named as Defendants in the Complaint. Moreover, as noted above, several of the Adley-Related Claimants were not named as defendants or listed as creditors by the Debtor, including Ann Adley, Jennifer Martin, Testa Hurwitz, Brown & Brown, Dwyer & Collora and FTI Ten Eyck. Nevertheless, the proposed order contains the following injunction against all the Adley-Related Claimants:

> Upon the Effective Date, all parties to this Interpleader and all persons, and entities including but not limited to direct and indirect claimants or potential claimants, receiving notice or constructive notice of the Motion are permanently barred and enjoined from:
>
> (a) asserting any claims, rights, causes of action, or demands of whatever

21

nature, whether known or unknown, foreseen or unforeseen, under the Policy against Lloyds and each of Lloyds' parents, subsidiaries, affiliates, insurers and reinsurers, and their respective directors, officers, employees, agents, representatives, attorneys, and all their respective heirs, executors, administrators, successors and assigns; and

(b) instituting, commencing or prosecuting any arbitration proceeding or any legal proceeding in any state or federal court, or any arbitral or administrative proceeding, against Lloyds and each of Lloyds' parents, subsidiaries, affiliates, insurers and reinsurers, and their respective directors, officers, employees, agents, representatives, attorneys, and all their heirs, executors, administrators, successors and assigns, with respect to or for any claims, causes of action, rights, attorneys' fees, costs, expenses, judgments, settlements, liabilities and damages, of whatever nature, whether known or unknown, foreseen or unforeseen, that have been, could have been, or could be asserted in any form, in connection with, in any way relating to, arising out of, directly or indirectly resulting from or in consequence of any of the following:

    (I) the Policy and/or its proceeds;
    (ii) The Underlying Litigation;
    (iii) the Lloyds Interpleader;
    (iv) the Counterclaims;
    (v) the Writ of Execution or the Turnover Motion;
    (vi) the Proofs of Claim;
    (vii) any past, present or future notice of claim or notice of potential claim under the Policy;
    (viii) any claim for coverage for "Loss" under the Policy, including, but not limited to costs, defense, indemnity or any other payments, services or benefits under the Policy or which otherwise relate to the Policy;
    (ix) any aspect of Lloyds' or its parents', subsidiaries', affiliates', insurers' and reinsurers', and any of their directors', officers', employees', agents', representatives', and attorneys', and all of their heirs', executors', administrators', successors' and assigns ' performance (or lack of performance), under or relating to the Policy or otherwise, of any duties or obligations, whether contractual, extra-contractual, tort, or otherwise, including, without limitation, any claims, demands or causes of action relating to any alleged claims handling, claims adjustment, actual or failed exhaustion, negligence, breach of contract, breach of duty or duties, breach of good faith and fair dealing, bad faith,

fraud, interference with contractual relationships, deceptive trade practices, conduct in violation of any insurance code or any other alleged misconduct, omission or wrongdoing of any kind;

(x) any act, omission, event, transaction, matter or cause which is alleged or which could have been alleged against Lloyds and its parents, subsidiaries, affiliates, insurers, reinsurers, directors, officers, employees, agents, representatives, attorneys, heirs, executors, administrators, successors and assigns with respect to, arising directly or indirectly from, in consequence of, or in any way involving the Underlying Claims, the Writ of Execution, the Lloyds Interpleader, the Counterlcaims [sic], the Key Partial Summary Judgment Motion, the Lloyds Proof of Claim, and the Proofs of Claim;

(xi) any act, omission, event, transaction, matter or cause which was alleged or which could have been alleged in the Lloyd's Interpleader, the Counterclaims, the Writ of Execution and the Key Partial Summary Judgment Motion;

(xii) any alleged right to recover any payments of any defense fees, costs, charges or expenses paid by Lloyds under the Policy; and

(xiii) any and all duties, liabilities and obligations under the Policy.

For the avoidance of doubt, nothing in this Paragraph 17 shall constitute a waiver or release or prevent any Settling Claimant from litigating, in the Lloyds Interpleader, its rights to any or all of the Disputed Proceeds.

Thus, the Joint Motion and the proposed order provide the settling parties with the right to litigate the Adley-Related Claimants' entitlement to the Reserve, including the right to dispute the priority of the Adley-Related Claimants' claims to the Reserve over the priority of the settling parties' claims to the proceeds.   The effect of these provisions, if implemented, would be to enable non-debtor third parties, who may or may not have claims against the Debtor, to litigate the amount of claims against the Policy made by the Adley-Related Claimants, none of whom, with the exception of Ann Adley, were named as defendants in this adversary proceeding.

23

E. The Objections to the Joint Motion

1. McDermott

McDermott, who represents that it was employed as counsel to the Debtor, Ann
Adley and Chancellor Corporation in litigation involving Huskins and the Securities and
Exchange Commission, opposes the Joint Motion because, in its view, the proponents
failed to allege sufficient facts to support a permanent injunction under Fed. R. Bankr. P.
7065. It complains that this Court "lacks jurisdiction to enjoin McDermott from seeking to
recover monies from Lloyds on bases that are related to but exist independently of the
Policy;" that the Movants may not circumvent Rule 7065 by seeking an injunction under
Bankruptcy Rule 9019; and that this is not an "extraordinary case" permitting an injunction
of claims of third parties against Lloyds. McDermott adds that the payments contemplated
by the signatories to the Joint Motion "violate the priority scheme mandated by the Policy
and are unfair to the non-settling Adley-Related Claimants such as McDermott." It adds:
"the proposed settlement would permit the Settling Claimants to challenge the claim of
McDermott, and receive additional monies, but not permit McDermott to challenge the
claims of the Settling Claimants." McDermott also objects to the Joint Motion because its
proponents proposes to allow and pay Key's claim even though Lloyds has argued its
claim is not covered by the Policy.

Specifically, McDermott argues that the Movants have failed to allege facts or
adduce evidence, by affidavit or otherwise, that would support the findings needed to
permanently enjoin it from pursuing its claim, particularly as it was not even named as a

24

defendant in the above-captioned adversary proceeding.  Moreover, it notes that the

Trustee is seeking to compromise the rights of third parties against a third party insurer,

a matter outside the scope of the trustee's business judgment and over which this Court

may lack jurisdiction, i.e., jurisdiction to bar the claims of one non-debtor against another

non-debtor.   Citing In re Combustion Engineering, Inc., 391 F.3d 190, 228-29 (3d Cir.

2004)("[s]ubject matter jurisdiction cannot be conferred by consent of the parties. Where

a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by

agreement even in a plan of reorganization."), and In re Salem Suede, Inc., 219 B.R. 922,

932-33 n. 8 (Bankr. D. Mass. 1998), it further argues that this Court lacks jurisdiction to

enjoin McDermott's claims against Lloyds that exist independently of the Policy, observing

the following:

> Lloyds may argue that without the injunction, it will not pay the proceeds of
> the Policy, and thus the settlement affects administration of the estate,
> thereby creating jurisdiction. The Third Circuit in *Combustion Engineering*
> expressly rejected this argument saying, "if that were true, a debtor could
> create subject matter jurisdiction over any non-debtor third party by
> structuring a plan in such a way that it depended upon thirty-party
> contributions. As we have made clear, subject matter jurisdiction cannot be
> conferred by consent of the parties." 391 F.3d at 228.

McDermott emphasizes that the parties to the Joint Motion have failed to address,

let alone satisfy, the five-factor test for determining when a court may exercise

"extraordinary discretion" under 11 U.S.C. § 105(a) to enjoin third parties as part of the

plan confirmation process.  Finally, in maintaining that the payments to the settling parties

pervert the priority scheme set forth in the Policy, it states the following:

> Moreover, property comes into the estate subject to all restrictions applicable

25

to that property under state law, unless the restriction is overridden by the Bankruptcy Code. *Landry v. Exxon Pipeline Co.*, 260 B.R. 769, 805 n. 62 (Bankr. M.D. La. 2001) *citing Butner v. United States*, 440 U.S. 48, 54-55 (1979). Thus, the proceeds of the Policy, to the extent they are property of the estate, must be distributed only in accordance with the Policy: this means, under the Policy, that only covered claims are entitled to be paid and they must be paid in accordance with the priority scheme set forth in the Policy. *See id.*

Here, the Policy requires that claims be paid in accordance with Section IV(E) (Lloyds "shall pay Loss in the order in which Loss is incurred."). Movants have adduced no evidence that the [sic] all of the Settling Claimants' claims arose before all of those of the non-settling Adley-Related Claimants. Upon information and belief, at least some of them did not.

Moreover, Key's claim, as Lloyds alleged in its complaint in the Adversary Proceeding, is not even covered under the Policy.

### 2. Ann Adley

Ann Adley states that her claims are "claims of breach of contract, infliction of emotional distress, and violation of G.L. c. 93A and/or c. 176D asserted against Lloyd's for its conduct, not claims against Lloyd's [sic] insured." She adds:

> [h]er claims are not contingent upon, or diminished in any way by, the existence or non-existence of coverage under the policy, but rather are brought upon Lloyd's breach [sic] of an unqualified promise to reimburse her for funds paid in association with the defense of her husband, misrepresentations made to her by Lloyd's, infliction of emotional distress, upon her by Lloyd's [sic], and various unfair and deceptive bad faith conduct by Lloyd's [sic] which harmed her.

Although stating that she lacks sufficient information to admit or deny most of the averments made in the Joint Motion, Ann Adley objects to the Joint Motion on grounds that Lloyds' $1.8 million contingent claim against the Debtors' estate for the recovery of certain defense costs is illusory because Lloyds has determined that there is coverage; the law requires Lloyds to provide a defense even if one or more claims are not covered; and

26

by bringing the interpleader action it necessarily maintains that it is a disinterested stakeholder and not a potential claimant to the fund it proposes to deposit in court. She argues that the representation of a meaningful distribution to creditors is conclusory and not substantiated by any pleadings or exhibits and that any "extracontractual claim" she may have against Lloyds "will have no positive or negative effect on the estate."

Ann Adley adds that this Court lacks jurisdiction to determine her claim against Lloyds, and "extraordinary circumstances," which would permit this Court to issue an injunction against her, are absent. She concludes that Lloyds cannot obtain a complete resolution of the claims against the Policy by "simply paying the estate, or on behalf of the estate, proceeds it already owes the estate, and deprive . . . [her] . . . of claims not within the estate."

### 3. Coulter

Coulter filed an Opposition to the Joint Motion in open court on September 21, 2005. Coulter states that he performed services at the request of various attorneys and his work product was used by the insureds, including the Debtor, Churchill and Peselman. He complains that "Lloyd's [sic] decision [to settle with some but not all claimants under the Policy] is in fact segregating claimants and increasing potential liability to other insured's [sic]." He alleges that all non-settling parties, with the exception of McDermott, have agreed in principal to the main provisions of the Settlement, namely to release Lloyds and reduce the amount of their claims. Despite, this, Coulter alleges, McDermott's failure to join the Settlement resulted in Lloyds' decision to exclude the Adley-Related Claimants.

27

Coulter implies that McDermott's demands for an unconditional release from the Debtor of his purported malpractice claims against it and its demands for the Debtor to consent to its withdrawal as his counsel in the Securities and Exchange Commission litigation resulted in the exclusion of the Adley-Related Claimants from the Settlement. Noting that the Debtor, Churchill and Peselman, through their attorneys, executed a joint defense agreement, Coulter asserts that McDermott's demand for an unconditional release by Brian Adley of his malpractice claim against the firm is problematic and that the bar order "would be paramount to allowing the fox in the hen house because inaction by Lloyds was the cause of many of the payment issues arising with respect to the Policy."

F. <u>Responses filed by Lloyds and Peselman to the Oppositions to the Joint Motion</u>

1. <u>Lloyds</u>

In its First Reply, Lloyds emphasizes the economic benefits to McDermott of the Settlement reflected in the Joint Motion. It states that the balance of Policy proceeds after payments to the parties to the Settlement would leave the sum of $949,444.16 in the Court's Registry.[10] It states that this sum "is calculated to include the full amount claimed by all Adley-Related Claimants" and that McDermott cannot possibly be harmed by any provision of the Partial Settlement. Moreover, Lloyds states:

> Lloyds is waiving its claim against the estate to recover fees already paid on behalf of Mr. Adley, and thereby Lloyds is also (derivatively) waiving all rights to recover as much as $1.2 million advanced to McDermott under a reservation of rights. The net effect: in addition to not having to waive any

---

[10] This sum is the difference between $2,373,475.34 and the total payments to the settling parties set forth in the chart on page 19.

28

rights, and being fully protected, McDermott actually is receiving substantial benefits from the Partial Settlement.

Lloyds further observes that it has paid McDermott approximately $1,054,069 to date for the Debtor's defense in various actions, subject to its reservation or rights. It also observes that McDermott failed to appeal the decision of this Court denying the Debtor's Motion for Relief from the Automatic Stay, failed to intervene in this adversary proceeding, and failed to file a proof of claim in the Debtor's bankruptcy case. It also states that McDermott has sought permission to withdraw from its representation of the Debtor in the action brought by the Securities and Exchange Commission, which is now pending in the United States District Court for the District of Massachusetts. According to Lloyds, the Debtor has opposed McDermott's withdrawal, although, allegedly, he also has made informal allegations of malpractice against McDermott. Characterizing McDermott's position, and perhaps the Debtor's position, as a pretext for dragging other parties into their disputes and holding them hostage, Lloyd's maintains that McDermott has no standing to object to the Settlement because it is not a creditor of the Debtor's bankruptcy estate, adding that it cannot argue that the Key judgment is an uncovered claim because that position is contrary to the position of its client, the Debtor.

Lloyd's maintains the requested injunction, the so-called Bar Order (the "Bar Order"), contained in the Settlement is "a necessary ancillary order under Section 105(a) and general principals of equity and interpleader, to advance the administration of the Bankruptcy Estate. . . ." Moreover, it rejects the assertion that there is no jurisdiction because, in its view, McDermott is asserting an interest in estate property, namely the

29

Policy Proceeds.  It concludes:

> without the Partial Settlement this will continue to be a no-asset case and
> little, if any, hope of funding sufficient for the Trustee to investigate and
> prosecute other sources of recovery for creditors. As for creditor assent, that
> has been satisfied here. Notice of the Partial Settlement and the Bar Order
> was given to all creditors and publication notice was made. The only timely-
> filed objections to the Bar Order are McDermott's and Ann Adley's.

Lloyds concludes that the Bar Order in the Settlement is "simply as a device to provide

Lloyds with an end to duplicative litigation against it (in exchange for releases of coverage

litigation, a claim, and special benefits to McDermott) while not requiring McDermott to

give up any substantive rights (and in fact giving them, in effect, substantial releases of

potential liability to Lloyds)."

Noting that Ann Adley is an insured under Clause 2.H of the Policy, which covers

lawful spouses of directors and officers when they are sued in such capacity, Lloyd's states

that Ann Adley was a defendant in the Huskins lawsuit and sought coverage; that Lloyds

has been paying the defense costs of her counsel, McDermott, and that she is seeking

payment from assets of the bankruptcy estate, thereby establishing this Court's jurisdiction.

Additionally, it relies upon her Answer and Counterclaim, which it characterizes as

compulsory, thus permitting this Court to exercise ancillary jurisdiction pursuant to 28

U.S.C. § 1367.

Lloyds also maintains that there is "a full reserve for the $181,000 that Mrs. Adley

is asserting" and that her other claims should not be given credence because she failed to

respond to its Motion to Dismiss her Counterclaim, and she is asserting her claims as "a

mere delaying tactic."  It concludes:

30

Mrs. Adley is getting significant direct benefits from the Partial Settlement: Lloyds is not only waiving any disgorgement claims in the event of noncoverage, but Lloyds is providing the funding for the settlement of the Huskins claim and obtaining a complete release for Mrs. Adley from the claims in that litigation. When combined with the fact that Mrs. Adley has had a full and fair opportunity to litigate her claims in this Court, has chosen simply not to respond, and has instead tried to slip away into another court, it is apparent that she is not losing any rights at all.

In rebuttal to Lloyd's arguments, McDermott rejects the contention that the Policy and the proceeds are property of the Debtor's estate. It maintains, contrary to a position it may have taken in the United States District Court for the District of New Jersey, but not in this Court, that the Debtor's estate has an interest in the proceeds of the Policy; not the exclusive right to them. Citing In re Boston Regional Medical Center, Inc., 285 B.R. 87, 96 (Bankr. D. Mass. 2002), it states that "[t]he Settling Claimants cannot simply divvy up those proceeds and ignore the claims of those who have an interest in the proceeds of the Policy through persons and entities other than the Debtor such as McDermott."

### 2. Key

Key parrots Lloyds' position that McDermott's Opposition "represents nothing more than an effort . . . to somehow gain leverage in its dispute with its client by holding third parties hostage through an attempt to scuttle the Partial Settlement." It also asserts that McDermott's claim to the Policy proceeds is derivative of the Debtor's claim and that it lacks standing to object to the Settlement because the reserve is sufficient to satisfy its claims in full.

### 3. Peselman

Peselman touts the economic advantages of the Settlement. He states:

31

[t]he compelling logic of the Partial Settlement Agreement is that it ends a large number of disputes between a large number of parties, while setting aside, thanks to Key's compromise, sufficient funds to allow the non settling [sic] parties full recovery of their legitimate claims. The non-settling parties' ability to achieve collection of their claims is not impaired by the settlement and, indeed, the non-settling parties stand in better stead because the Partial Settlement Agreement has procured funds released as a result of Key's compromise, that may not be applied to their claims. Debtor's wife Ann Adley, attempts to upend that compelling logic by asserting that she has a mega dollar "off contract" claim against Lloyds that is not fully funded by the settlement.

Peselman also suggests that Ann Adley's attempt to withdraw her Answer and Counterclaim is a nothing more than forum shopping, a ruse employed to avoid responding appropriately to Lloyd's Motion to Dismiss her Counterclaim, which, in his view, was a motion for summary judgment as to the merits of her claim.

G. Lloyds' Motion to Dismiss the Counterclaims of Ann Adley and Brian Adley

Lloyds seeks dismissal of Ann Adley's Counterclaim pursuant to Fed. R. Civ. P. 12(b)(6), made applicable to this proceeding by Fed. R. Bankr. P. 7012. It its Motion, it states that "Ann Adley is not an insured under the Policy, and her Counterclaim makes no claim against Lloyds for coverage of losses she incurred due to claims made against her." It concludes that she cannot recover under and any theory of contract or tort. It also argues that she failed to plead her claims with particularity.

With respect to the Debtor's Counterclaim, Lloyds seeks dismissal because the Debtor does not control the claims relating to the prepetition period, citing, *inter alia*, Bezanson v. Thomas (In re R&R Assocs. of Hampton), 402 F.3d 257, 265 (1st Cir. 2005)(malpractice claims against attorneys for Chapter 11 debtor belonged to Chapter 7

estate when case was converted to Chapter 7 and trustee as successor estate representative assumed the powers of the debtor in possession to bring the claims), and because Lloyds' conduct with respect to the Policy during the postpetition period cannot have caused the Debtor harm because the automatic stay prevented it from paying under the Policy.

G. Ann Adley's Motion for Leave to Withdraw and Abstain

In her Motion, Ann Adley represents that she is not a defendant in the Securities and Exchange Commission litigation, not an insured of Lloyds' Policy, not a debtor, and not a creditor in the Debtor's case. She alleges that Lloyds balked at providing a defense to the insureds and that she is owed $181,000, plus interest, for funds advanced in connection with the defense of the Debtor and others, a circumstance which she maintains caused her to lose her home to foreclosure. Accordingly, she states she has a claim against Lloyds for "breach of contract (not a contract of insurance but a contract to reimburse money), for violations of c. 93A, for fraud, misrepresentation, and infliction of emotional distress not only with respect to losing her home but losing its market value due to a distress sale." Citing a number of cases from the First Circuit, she avers that she does not seek to deplete the estate and that the outcome of the controversy cannot conceivably affect the bankruptcy estate. Accordingly, she seeks leave to withdraw her Answer and her Counterclaim and "substitute therefore a motion to dismiss the interpleader action and/or abstain from it, as it relates to her."

Ann Adley attached to her Motion to Dismiss or Abstain a five-count Complaint she filed against Lloyds in the Suffolk Superior Court, Department of the Trial Court, in which

33

she requested a jury trial.

H. Lloyds' Objection to the Motion for Leave to Withdraw or Abstain

Lloyds complains that Ann Adley's Motion is "merely a last-minute attempt to

avoid the orderly jurisdiction of this Court." It argues the following:

> . . . She asserts that she is not a defendant, not an insured and not a creditor.
> The facts are entirely to the contrary. There is unquestionable jurisdiction
> over Mrs. Adley because she is an insured under the Policy, who has sought
> coverage for both defense costs and payment of any judgment or settlement
> of the Huskins Litigation, in which she is a named defendant. The Policy
> includes, in Clause 2.H, coverage for lawful spouses of directors and officers,
> when the spouse is sued in such capacity. McDermott Will & Emery LLP has
> been defending Mrs. Adley in the Huskins Litigation, has been paid for that
> work (subject to a reservation of rights) from the Policy, and is currently (in
> its Objection to the Partial Settlement) claiming even more payment for
> defense costs for Mrs. Adley. It also appears that Mrs. Adley is a creditor of
> Mr. Adley, albeit a creditor who did not file a proof of claim. The crux of her
> allegations against Lloyds is that she advanced money to pay Mr. Adley's
> defense costs, and thus she would have a right of reimbursement from Mr.
> Adley. As can be seen, the Interpleader was not "evasive action by a mere
> expedience of adding her name to the caption." *See* Withdrawal Motion at
> para. 4. Rather, she is at the very core of the disputes in the Interpleader and
> this bankruptcy case, just like the other insureds under the Policy that are
> named defendants.
>
> ***
>
> With this clear jurisdictional base, a straightforward application of the
> compulsory-counterclaim rules of Bankruptcy Rule 7013 (and the
> supplemental jurisdiction provisions of 28 U.S.C. § 1367) brings Mrs. Adley's
> counterclaim properly before this Court for resolution. Compulsory
> counterclaim practice is applicable to insurance interpleader situations. *See
> Wayzata Bank & Trust Co. v. A&B Farms*, 855 F.2d 590, 593 (8th Cir. 1088) (In
> interpleader context, court held that "claimants counterclaim was a
> compulsory counterclaim, in which the court could exercise its ancillary
> jurisdiction, obviating any possible subject matter jurisdiction problems.").

In its Supplemental Brief, Lloyds expands its argument that this Court has jurisdiction to

34

determine both her claims against the Policy and her so-called "off the Policy claims."

Specifically, with respect to the "off the Policy" claims, it states this Court has jurisdiction

because all of Ann Adley's claims are compulsory counterclaims. It states that the claim

"is at the core of the bankruptcy court's jurisdiction, and is both "related-to" (by

increasing/decreasing the size of the estate) and "arising in" as a determination

fundamental to the case." It states that there is a serious question as to whether the claim

she asserts is actually a claim that is property of the estate.

Noting that the Partial Settlement and the Bar Order will be effective only after this

Court makes a determination on the merits of Ann Adley's Counterclaim based on the

Motion to Dismiss, it states that the injunction "is simply to prevent Mrs. Adley from

continuing her attempts to impose additional litigation costs on Lloyds by proceeding with

the same claims in state court."

## III. DISCUSSION

### A. <u>Standards for the Approval of Compromises and the Issuance of Injunctions</u>

#### 1. Approval of Compromises

Bankruptcy Rule 9019(a) provides as follows: "On motion by the trustee and after

a hearing on notice to creditors, the debtor and indenture trustees as provided in Rule

2002(a) and to such other entities as the court may designate, the court may approve a

compromise or settlement." Fed. R. Bankr. P. 9019. The First Circuit has articulated the

specific factors which a bankruptcy court should consider when evaluating a proposed

compromise. They are: "(i) the probability of success in the litigation being compromised;

(ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and, (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise." Jeffrey v. Desmond, 70 F.3d 183, 185 (1st Cir. 1995)(citing In re Anolik, 107 B.R. 426, 429 (D. Mass. 1989)).  The proponent of a proposed compromise or settlement bears the burden of proof, and "the court should avoid second-guessing the Trustee in the exercise of his business judgment." Morris v. Nat'l Union Fire Ins. Co. (In re Eastwind Group, Inc.), 303 B.R. 743, 751 (E.D. Pa. 2004)(Chapter 11 case).  Instead, "the court should endeavor to ascertain whether the terms of the Trustee's proposed settlement fall below the lowest range of reasonableness." Id.

2. Entry of Injunctive Relief

A central component of the Partial Settlement is the issuance of an injunction or Bar Order against "all parties to this Interpleader and all persons, and entities including but not limited to direct and indirect claimants or potential claimants, receiving notice or constructive notice of the Motion" from asserting any claims against Lloyds or any of its affiliates or agents.  While not expressly stated in the Joint Motion, the parties to the Partial Settlement rely on § 105 of the Bankruptcy Code which authorizes the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provision of this title." *See* 11 U.S.C. § 105(a).

In In re G.S.F. Corp., 938 F.2d 1467 (1st Cir. 1991), the First Circuit stated: "This grant of equitable power is not unlimited. 'While 11 U.S.C. § 105(a) does grant the

36

bankruptcy court broad powers . . . it is an *extraordinary exercise of discretion* to use that power to stay a third party action not involving the debtor.'" Id. at 1474 (citing In re Brentano's, Inc., 36 B.R. 90, 92 (S.D.N.Y.1984)) (emphasis supplied). The First Circuit added: "In the ordinary case involving an injunction against a third party action, there must be some effect on the debtor's estate stemming from the action before there is bankruptcy court jurisdiction to enjoin it." 938 F.2d at 1474.

The injunction requested by the proponents of the Joint Motion implicates § 524(e) of the Bankruptcy Code, as well as § 105(a). Section 524(e) provides: "Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for such debt." 11 U.S.C. § 524(e). Section 524(e) is implicated because Lloyds, through the Joint Motion, is conditioning the Settlement on the entry of an order providing that it will have no further liability with respect to the Policy, as well as on the dismissal with prejudice of any so-called extracontractual claims against it asserted by Ann Adley in her Counterclaim or by McDermott, even if the holders of these claims were not listed as creditors by the Debtor and did not file claims against the bankruptcy estate and are thus unaffected by the Debtor's discharge.

In In re Mahoney Hawkes, LLP, 289 B.R. 285 (Bankr. D. Mass. 2002), the bankruptcy court discussed third party releases and injunctions in conjunction with the denial of the debtor's motion to approve a disclosure statement which described a plan of reorganization predicated upon the release of, and issuance of a permanent injunction to

37

protect, a liability insurer.   It stated:

> Three circuits have held that § 524(e) prohibits approval of third party releases and injunctions. <u>Resorts International, Inc., v. Lowenschuss</u>, 67 F.3d 1394, 1401 (9th Cir.1995) [*cert. denied*, 517 U.S. 1243 (1996)]("this court has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."); <u>Feld v. Zale Corp., (In re Zale Corp.)</u>, 62 F.3d 746, 761 (5th Cir.1995) ("Accordingly, because the permanent injunction as entered improperly discharged a potential debt of CIGNA, a nondebtor, the bankruptcy court exceeded its powers under § 105."); <u>Landsing Diversified Props.-II v. First Nat'l Bank & Trust Co., (In re Western Real Estate Fund, Inc.)</u>, 922 F.2d 592, 601 (10th Cir.1990), *modified sub nom.*, <u>Abel v. West</u>, 932 F.2d 898 (10th Cir.1991) ("Not only does such a permanent injunction improperly insulate nondebtors in violation of section 524(e), it does so without any countervailing justification of debtor protection--as discussed earlier, the discharge injunction provided for in section 524(a) already frees the debtor from potential derivative claims, such as indemnification or subrogation, that might arise from the creditor's post-confirmation attempts to recover the discharged debts from others.").
>
> Other courts conclude that the quoted statutory and rules provisions merely explain the effect of a debtor's discharge and do not explicitly prohibit such injunctions. <u>Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)</u>, 280 F.3d 648, 657 (6th Cir.), *cert. denied*, 537 U.S. 816, 123 S.Ct. 85, 154 L.Ed.2d 21 (2002). Pursuant to 11 U.S.C. § 105, they allow such injunctions under special circumstances. *See e.g.* <u>id.</u> at 658 ("Because such an injunction is a dramatic measure to be used cautiously, we follow those circuits that have held that enjoining a non-consenting creditor's claim is only appropriate in 'unusual circumstances.'"); <u>In re Specialty Equip. Cos., Inc.</u>, 3 F.3d 1043 (7th Cir.1993); <u>Securities and Exchange Commission v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)</u>, 960 F.2d 285, 293 (2nd Cir.1992); <u>Menard-Sanford v. Mabey (In re A.H. Robins Co.)</u>, 880 F.2d 694, 702 (4th Cir.1989); <u>Greenblatt v. Richard Potasky Jeweler Inc. (In re Richard Potasky Jeweler, Inc.)</u>, 222 B.R. 816, 825 (S.D. Ohio 1998) ("Therefore, where a permanent injunction, regardless of the identity of its direct beneficiary, serves to protect the property or facilitate the administration of the debtor's estate, § 524(e) will not stand in the way of the court issuing the injunction.").

<u>Id.</u> at 297.   Noting that the First Circuit in <u>Monarch Life Ins. Co. v. Ropes & Gray</u>, 65 F.3d

973, 983-84 (1st Cir.1995),[11] identified but did not rule on the issue, id. at 298, the court

formulated the appropriate test for the issuance of an injunction as follows:

> (1) [A]n identity of interests between the debtor and the third-party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against he [sic] debtor or will deplete the assets of the estate;

> (2) The non-debtor has contributed substantial assets to the reorganization;

> (3) The injunction is essential to the reorganization. . . .;

> (4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has 'overwhelmingly' voted to accept the proposed plan treatment;

> (5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

Id. (citing In re Master Mtg. Inv. Fund, Inc., 168 B.R. 930, 935 (Bankr. W.D. Mo. 1994)).

--------------------------------

[11] In Monarch Life, a case in which the Chapter 11 debtor's former attorneys, Ropes & Gray, moved to hold the debtor's subsidiary in contempt for violating an injunction entered in conjunction with the confirmation of the debtor's plan of reorganization, the First Circuit stated:

> In extraordinary circumstances, it has been held that a bankruptcy court can grant permanent injunctive relief essential to enable the formulation and confirmation of a reorganization plan if, for example, nondebtors who would otherwise contribute to funding the plan will not settle their mutual claims absent "protection" from potential post-confirmation lawsuits arising from their prepetition relationship with the chapter 11 debtor. See, e.g., In re A.H. Robins Co., 880 F.2d at 702. These courts have taken into consideration whether (1) the creditors have overwhelmingly approved the plan, with the injunction; (2) the plan contemplates full payment of all creditor claims; and (3) the injunction would affect a relatively small class of claimants. Id. at 698, 700-702; In re Master Mortgage, 168 B.R. at 935.

65 F.3d at 979-80.

B. The Policy and Its Proceeds

The parties have relied upon this Court's statement that both the Policy and its proceeds are property of the Debtor's bankruptcy estate. The Court's order dated February 9, 2005 was made in conjunction with the Motion filed by Brian M. Adley for Relief from Stay. In retrospect, this Court's statement was overly broad and must be modified. [12]

In contrast to the proceeds of the Policy, the Policy itself, which was obtained by Chancellor Corporation for the benefit of its officers and directors, is not property of this Debtor's bankruptcy estate. See, e.g., In re Allied Digital Technologies Corp., 306 B.R. 505 (Bankr. D. Del. 2004); In re Cybermedica, Inc., 280 B.R. 12 (Bankr. D. Mass. 2002). In Cybermedica, the court observed: "[t]he majority view is that insurance *policies* are property of the bankruptcy estate [of a corporate debtor] and protected by the automatic stay provision of Section 362 of the Code . . . [but] . . . courts are in disagreement on whether or not insurance *proceeds* are property of the estate [of the corporate debtor that obtained the policy]." Id. at 16 (citations omitted).

Assuming for purposes of this decision that the proceeds of the Policy are available to the directors and officers of Chancellor Corporation, this Court agrees with the characterization of the proceeds advanced by counsel to the Trustee at the September 21,

────────────────

[12] "Section 105(a) grants the Bankruptcy Court broad authority to reconsider any of its own orders and to issue new orders *sua sponte* whenever necessary to carry out provisions of the Bankruptcy Code." In re Weinstein, 217 B.R. 5, 8 (D. Mass. 1998), *aff'd*, 164 F.3d 677 (1st Cir. 1999)(citing In re H.K. Porter Co., Inc., 156 B.R. 149, 150 (Bankr. W.D. Pa. 1993); In re Brielle Assocs., 685 F.2d 109, 111 (3d Cir. 1982)).

40

2005 hearing.  In discussing issues regarding the Policy, he stated: "Mr. Adley, while an insured . . . under the policy, isn't the only insured under the policy, and there are other non-debtor insured persons who are claiming under the policy.  In the past we have referred to this interest in the policy as really being one akin to a co-owner of an undivided interest."  Transcript, September 21, 2005, at 4. *See* Butner v. United States, 440 U.S. 48, 55 (1979)("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interest party is involved in a bankruptcy proceeding.").

Viewed in this light, it would appear that the officers and directors of Chancellor Corporation, and, in particular, Churchill and Peselman, hold contingent, unliquidated claims against an asset of the Debtor's estate, namely the Policy proceeds.  Notably, though active in the case, neither filed a proof of claim.

C. Jurisdiction

In litigation involving nondebtor, third parties, as is the circumstance here, and in cases where the Court is asked to enter an injunction against nondebtors under § 105(a), the Court must determine whether it has subject matter jurisdiction, as well as authority under applicable law to enter the requested relief.  Section 1334 of title 28 vests jurisdiction in district courts over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334. The district court, in turn, may refer these civil proceedings to the bankruptcy court.  Moreover, 28 U.S.C. § 157 distinguishes between "core" proceedings in which the bankruptcy court can enter final judgments and

41

"noncore," or "related-to," proceedings in which the bankruptcy court must make

proposed findings of fact and conclusions of law for submission to the district court.

Generally, core proceedings are those which invoke substantive rights provided by title 11

("arising under" jurisdiction) or which arise only in the context of a bankruptcy case

("arising in" jurisdiction).  "Arising in" jurisdiction pertains to those matters which are

administrative in nature such as the allowance of claims, counterclaims by the estate

against persons filing claims against the estate, and turnover of estate property.  *See* 28

U.S.C. § 157(b)(2).  Bankruptcy judges are charged with determining, on their own motion

if necessary, whether a proceeding is a core proceeding or is otherwise related to a case

under title 11.  Id. at § 157(b)(3).

    D. Analysis

    The Complaint for Interpleader and Declaratory Relief raises two issues: 1) whether

this Court has jurisdiction to approve the Settlement or, perhaps, more germanely, whether

this Court has jurisdiction to implement and enforce the Settlement once approved; and

2) whether this Court can enter the Bar Order consistent with the standard articulated by

courts in this jurisdiction.  The interpleader action, as filed, could conceivably fall within

the bankruptcy court's core jurisdiction as a proceeding involving a counterclaim by the

estate against persons filing claims against the estate (i.e., Lloyds or Key) or be considered

a proceeding "affecting the liquidation of the assets of the estate, or adjustment of the

debtor-creditor . . . relationship."  Id. at § 157(b)(2)(C) and (O).  The Partial Settlement,

however, expands the jurisdictional horizon from that presented by the Complaint for

42

Interpleader as the Settlement proponents ask this Court to do far more than determine

competing claims by the insureds to the proceeds pursuant to ¶ IV.E of the Policy. They

ask this Court to enjoin parties who have not been named as defendants in this adversary

proceeding and whose claims against the Policy, the estate, and other insureds have not

been pleaded in the Complaint. The insureds with competing claims to the Policy

proceeds, not to mention the professionals holding derivative claims against them, have

not been listed by the Debtor in his Schedules or even adequately disclosed in the Joint

Motion, yet, pursuant to the Partial Settlement, they are given the right to object to the

claims of the Adley-Related Claimants, many of whose claims, in turn, were not scheduled

by the Debtor. While related-to jurisdiction is expansive, the relief requested in the Joint

Motion, in this Court's view, stretches the concept beyond that contemplated by the Third

Circuit in Pacor v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984), *overruled on other grounds by,*

Things Remembered, Inc. v. Petrarca, 516 U.S. 124 (1995), and its progeny, including the

First Circuit's decision in In re G.S.F. Corp., 938 F.2d 1467, 1475 (1st Cir. 1991). At its most

extreme, almost any action involving property of the estate, such as the Policy proceeds,

here, or the Debtor, could conceivably have some impact on the estate. The allowance of

the Joint Motion and the concomitant approval of the Settlement, however, would require

this Court to not only determine the Debtor's share of the Policy proceeds, but also the

claims of other insureds and the professionals who represented them regardless of the

whether they hold claims against the Debtor. Thus, the expedient of a $40,000 payment to

the Trustee cannot create jurisdiction where none exists, particularly where, in the normal

43

course, the Debtor's defense costs would be paid but he would not personally receive proceeds.

Moreover, this Court's equitable powers to enter this type of injunctive relief contemplated by the settling parties is constrained by the directive of the Supreme Court: "whatever equitable powers remain in the bankruptcy must and can only be exercised within the confines of the Bankruptcy Code." Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988). In other words, § 105(a) does not confer jurisdiction on this Court nor create substantive rights which are otherwise unavailable under applicable law. As one commentator has observed, "the bankruptcy court's jurisdiction over a request to enjoin actions between nondebtors frequently turns on whether the action sought to be enjoined could affect administration of the debtor's estate . . . [an] inquiry remarkably similar to the generally accepted test of related jurisdiction, which also focuses on an action's potential effect on the bankruptcy estate." *See* Howard C. Buschman III and Sean P. Madden, *The Power and Propriety of Bankruptcy Court Intervention in Actions between Nondebtors*, 47 Bus. Law. 913 (1992) (citing Pacor v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984)).

Although the Trustee and Lloyds focus on Lloyds' waiver of its claim against the bankruptcy estate and willingness to deposit the remaining Policy proceeds in the Court's Registry, subject to the entry of the Bar Order, this Court must focus, not on the merits of either Ann Adley's claim or McDermott's claim, but on the relationship and effect of those claims against Lloyds and the Policy proceeds to the bankruptcy estate. The Debtor's bankruptcy estate includes, *inter alia,* his claim against Lloyds under the Policy for

44

reimbursement of defense costs. His creditors include Key, which filed a proof of claim in

the sum of $1,369,222, which claim, though reduced to judgment against Churchill, has not

been reduced to judgment against him, as well as Lloyds and Huskins. Lloyds has filed a

contingent claim in the sum of $1,823,740.34; Huskins has filed a proof of claim in the sum

of $14,770,000. None of the other Defendants in the Interpleader or any of the other parties

to the Partial Settlement have filed proofs of claim, including the other insureds, Churchill

and Peselman, or any of the attorneys or professionals who represented them. The Court

finds that, although it may have related jurisdiction with respect to the resolution of the

competing claims to the Policy proceeds by the insureds under the Policy, it lacks

jurisdiction to put its imprimatur on a Settlement of the claims of professionals who have

asserted claims either against nondebtor insureds or against Lloyds. The Court certainly

lacks jurisdiction to enjoin the "extracontractual" claims of nondebtors against Lloyds no

matter how frivolous Lloyds believes those claims to be, as such claims can have no

conceivable impact on the estate other than to potentially scuttle the Settlement which nets

the estate $40,000. It begs the question, however, to posit jurisdiction based upon the effect

upon the estate caused by a refusal to approve the Partial Settlement.

Additionally, the Court lacks jurisdiction to entertain the objections of nondebtor

parties to the Settlement to the claims against the Policy of the Adley-Related Claimants,

who were not given notice of the deadline for filing proofs of claim and may have

counterclaims against the insureds. Although the parties have structured the Settlement

in such away as to cause the size of the estate to increase, albeit it minimally, as a result of

the disallowance or reduction of the Adley-Related Claimants' claims to the Policy proceeds, this Court is not the proper forum for disputes, for example, between the holders of derivative claims against insureds, such as Churchill and Peselmen.

Under these circumstances, the Court finds that an exercise of supplemental jurisdiction pursuant to 28 U.S.C. § 1367,[13] even if permissible, is unwarranted. In <u>Singer</u>

---

[13] Section 1367 provides the following:

(a) Except as provided in subsection (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

(b) In any civil action of which the district courts have original jurisdiction founded solely on section 1332 of this title, the district courts shall not have supplemental jurisdiction under subsection (a) over claims by plaintiffs against persons made parties under Rule 14, 19, 20, or 24 of the Federal Rules of Civil Procedure, or over claims by persons proposed to be joined as plaintiffs under Rule 19 of such rules, or seeking to intervene as plaintiffs under Rule 24 of such rules, when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of section 1332.

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if--
    (1) the claim raises a novel or complex issue of State law,
    (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
    (3) the district court has dismissed all claims over which it has original jurisdiction, or
    (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

v. Adamson, No. 05-1356, Slip op. at 15 (Bankr. D. Mass. 2005), this Court observed the

following:

> There appears to be a split of authority as to whether 28 U.S.C. § 1367 can
> expand bankruptcy court jurisdiction. Compare In re Pegasus Gold Corp., 394
> F.3d 1189 (9th Cir. 2005), and In re Eads, 135 B.R. 387 (Bankr. E.D. Cal. 1991)
> with Matter of Walker, 51 F.3d 562 (5th Cir. 995), and In re Foundation for
> New Era Philanthropy, 201 B.R. 382, 398 (Bankr. E.D. Pa. 1996). In Pegasus
> Gold, the Ninth Circuit concluded that the doctrines of pendent and ancillary
> jurisdiction provide an additional source of jurisdiction for bankruptcy
> courts.  It determined that "the bankruptcy court could properly exercise
> supplemental jurisdiction over these claims," stating that "[p]ursuant to 28
> U.S.C. § 1367, district courts have 'supplemental jurisdiction over all other
> claims that are so related to claims in the action within [the court's] original
> jurisdiction that they form part of the same case or controversy under Article
> III of the United States Constitution.'" 394 F.3d at 1194-95. It added: " This
> circuit has applied § 1367 to bankruptcy claims, even when the subject
> matter jurisdiction is based on "related to" bankruptcy jurisdiction. Id. at
> 1195 (citing Sec. Farms v. Int'l Bhd. of Teamsters, 124 F.3d 999, 1008 n. 5 (9th
> Cir.1997)).

Adamson, Slip op. at 16.

Despite the decision in Pegasus Gold, other courts have reached a different

conclusion.  As this Court noted in Adamson,

> Despite Ninth Circuit support for bankruptcy court jurisdiction under 28

---

> (d) The period of limitations for any claim asserted under subsection (a),
> and for any other claim in the same action that is voluntarily dismissed at
> the same time as or after the dismissal of the claim under subsection (a),
> shall be tolled while the claim is pending and for a period of 30 days after
> it is dismissed unless State law provides for a longer tolling period.

> (e) As used in this section, the term "State" includes the District of
> Columbia, the Commonwealth of Puerto Rico, and any territory or
> possession of the United States.

28 U.S.C. § 1367.

U.S.C. § 1367, [the] Fifth Circuit in <u>Matter of Walker</u>, 51 F.3d 562 (5th Cir. 995), and the bankruptcy court in <u>New Era</u> reached a different conclusion. *See also* <u>In re Bass</u>, 171 F.2d 106 (5th Cir. 1999).   In <u>New Era</u>, the court observed: "[b]y its express terms . . . section 1367 is applicable only to the district court; it makes no reference to the bankruptcy court (nor does the legislative history surrounding its enactment)." 201 B.R. at 398.

<u>Adamson</u>, Slip op. at 16-17.  In view of the spilt of authority with respect to the bankruptcy exercise of supplemental jurisdiction, this Court concludes that the exercise of supplemental jurisdiction for purposes of allowing the Joint Motion and the entry of the injunctive relief upon which the Joint Motion is predicated, would be an abuse of discretion in light of the numerous problems, discussed in more detail below, associated with the Partial Settlement.[14]  As noted above, this Court finds that its jurisdictional grant is not so broad as to enable it to determine all claims against the Policy and all claims of parties with claims derived from Peselman and Churchill against the Adley-Related Claimants whose claims against the Policy are derived from the Debtor, and perhaps the other insureds, as opposed to claims against property of the estate.  Moreover, to the extent that Ann Adley, McDermott, and possibly others, may have direct claims against Lloyds, the Court finds that it lacks even related jurisdiction to determine those claims or enjoin their assertion against Lloyds.

The thrust of the Partial Settlement is not a resolution of claims against the bankruptcy estate but a resolution of claims against the Policy made by parties who, for the

---

[14] The Court does not question the practicality and economic sense of the Settlement.  Indeed, the parties must be commended for their efforts in attempting to avoid litigation.

most part, have not filed claims against the bankruptcy estate.  The Partial Settlement has many of the hallmarks of a reorganization plan, as through it the parties have attempted to resolve the competing claims against a single res.  The Debtor's case is not a Chapter 11 case, and the parties' attempt to utilize the <u>Master Mortgage</u> factors to persuade this Court to enter the injunction upon which the Settlement is conditioned is unsupported by any authority.  Several factors which the Court would have to evaluate are simply irrelevant in a Chapter 7 case.  For example, this Court cannot equate the absence of objection to the Joint Motion to an overwhelming vote to accept a proposed plan treatment or find that approval of the Partial Settlement and entry of the Bar Order is necessary to a reorganization.  The Settlement's mechanism for the payment of all or substantially all claims cannot supply the Court with related to jurisdiction to determine extracontractual claims against Lloyds.   The attempt by Lloyds and the other parties to the Settlement to parlay the factors germane to the entry of an injunction in conjunction with the confirmation of a plan of reorganization to this Chapter 7 case is unavailing.  In short, the entry of the Bar Order would be extraordinary abuse of discretion.

Under these circumstances, the Court finds that the proponents of the Settlement, have failed to sustain their burden of proof with respect to the entry of a permanent injunction which is a condition of the approval of the Settlement.  To repeat, the factors articulated by the courts in <u>Monarch Life</u>, <u>Mahoney Hawkes</u>, and <u>Master Mortgage</u>, are absent in this case.   Because this Court cannot enter the injunctive relief requested, the Settlement by its terms fails.  Nevertheless, the Court is compelled to observe that even if

49

it were to limit its inquiry to an examination of the <u>Jeffrey v. Desmond</u> factors, it lacks

sufficient information about the holders of, and nature of, the derivative claims against

Churchill, Peselman and the Debtor, the insureds under the Policy, as well as the

relationship of those claims to the Debtor's bankruptcy estate. Moreover, the Court finds

that with respect to the probability of success and the complexity of the litigation involved,

the issues would appear to be simple, though their resolution may be complex because of

the number of insureds and the various pending lawsuits. The issues are: 1) Whether the

claims against the proceeds are covered under the Policy or excluded? and 2) What is the

order in which the losses were incurred?  Though the parties to the Partial Settlement have

accepted Lloyds' view of the issues, this Court has been presented with little evidence to

support the conclusory statements made in the pleadings.  The Court lacks sufficient

information to make any type of informed decision about the complexity of the facts and

issues pertinent to the Complaint for Interpleader and Declaratory Relief, let alone Ann

Adley's status as an insured under the Policy, notable given that both Lloyds and Ann

Adley have waffled on the issue and adopted contrary and inconsistent positions.

The status of the professionals or other parties who performed prepetition services

for the Debtor is worth exploring, but the proponents of the Settlement Agreement

provided the Court with scant information.  To the extent the professionals are unsecured

creditors of the Debtor, most were not listed as creditors, thereby creating an issue as to

whether their claims should be discharged as a matter of due process or under 11 U.S.C.

§ 523(a)(3).  Certainly, there are issues as to whether the Trustee or other parties to the Joint

50

Motion can object to their claims to Policy proceeds on grounds that they failed to timely file proofs of claim.  *See* Fed. R. Bankr. P. 3002(c).  Moreover, the manner in which the Settlement is structured - - creditors with claims against the Policy proceeds are preferred over other general unsecured creditors and they also have an incentive to object to the claims of the Adley-Related Claimants against the Policy proceeds on ground that the Claimants did not file proofs of claim - - is problematic in view of representations that some professionals performed services for all of the insureds, meaning that, not just McDermott, but Churchill and Peselman, should have been listed as creditors with contingent and unliquidated claims against the estate.  Finally, the procedural vehicle for such endeavors is unclear.

## IV. CONCLUSION

In view of the foregoing, the Court shall enter orders denying the Joint Motion and granting Lloyds' Motion to Dismiss the Counterclaim of Brian Adley.[15] The Court shall also enter orders granting Ann Adley's Motion for Leave to Withdraw or Abstain to the extent that she seeks to assert claims against Lloyds and not against the Policy and denying Lloyds' Motions to Dismiss her counterclaims

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated: November 16, 2005
cc: Donald F. Farrell, Jr., Esq., Anthony L. Gray, Esq., Steven J. Mandelsberg, Esq., D. Ross Martin, Esq., Noel Donnelly, Evans J. Carter, Esq., John J. Falvey, Jr., Franklyn Chruchill, William J. Dailey, Jr., Esq., Mark W. Smith, Esq., Gary S. Matsko, Esq., Michael Kendall, Esq., Brain Adley, Michael A. Collora, Esq., Jennifer Marten, Sarah E. Hinkley, Derek Coulter, Carl Jenkins, Esq., Charles P. Kazarian, Esq.

---

[15] Neither the Trustee nor the Debtor filed a written objection to Lloyds' Motion to Dismiss.  The Debtor orally objected to the Motion to Dismiss representing that some portion of his counterclaim arose postpetition.  To the extent the counterclaims include prepetition claims, only the Chapter 7 Trustee is empowered to prosecute them.  Accordingly, the Court's dismissal of the Debtor's counterclaims shall be without prejudice to any postpetition claims the Debtor may have against Lloyds.

52